We move to the sixth case this morning, Brace v. Saul. I'd say good morning, but I'm not sure it's still morning. It still is morning. My name is Randall Forbes. I represent the disability claimant Aaron Brace. This case primarily involves step five, which is when the analysis of disability enters the phase where the determination as to whether or not there can be other jobs and what are the numbers of those national jobs. This area of law, in some sense over the last year, is in a state of flux. The United States Supreme Court, in the case of Vistek v. Berryhill, did chime in on step five. Mostly they were looking at issues that related to arriving at numbers from surveys and extrapolating from a survey. Here, and the other important thing about the Vistek case, is that it cited this court's case in Chavez v. Berryhill. And the importance of the Chavez case is that it was the culmination of this court's jurisprudence in the step five area, which I think leads the nation in the Supreme Court of the United States by citing Chavez the way it did, was affirming that. So the point of all of that is here we are again with a step five analysis by a vocational expert that is deficient. The vocational expert tried to explain his methodology. You can read that. It takes about a page in the record. He talks about how he looks at standard occupational codes, which are the broad category of jobs from the labor statistics, and then how he goes through a process of weighting and then arriving at his numbers, although he never gets specific enough to tell us the most important piece of information, and that is what is the weighting factor. And so just like the Laura case and the Browning case and the Chavez case, the evidence to support the national numbers is not sufficient. It does not rise to the level of substantial evidence or reliability, and therefore the commissioner has failed in his burden at step five. At a minimum, this case should be remanded, and arguably because they have the burden at step five, you should award benefits to the disability claimant. What is the reverse that's supposed to go back and what and be more specific about what jobs are available? They're not only more specific, they need to come up with a rational methodology so that the national numbers are more than a mere fabrication to use the Laura case's language. Quite frankly, they're pulling numbers out of a hat, Your Honor, and we're trying to get the vocational experts to tighten up their analysis. Well, I assume you tighten it up. You mean tighten it up to local versus nationwide? No, trying to get the methodology, the mathematical process, the polling process, the extrapolation process to have a connection to reality because if you don't have a connection to reality. What's reality? Reality, when you're determining national numbers, the reality is what is a reliable number? You can get to that point if you do scientific polling and go up. The vocational experts, a sizable part of them think that you can take a broad category and make some tweaks with the broad category and find out something about the smaller category. That's what this court's jurisprudence has talked about and has frowned upon and we're still there. We're still used to the RFC, residual functional capacity. I mean, that's what we're trying to look at is this person, what's capable of doing? They give examples, I guess, of certain jobs. Right. Now, I don't know what... The jobs, here's the thing about vocational experts, they're really good at classifying the job. They are not so good at coming up with valid national numbers. What do the national numbers have to do with the locality where this person is? The statute talks about national numbers. That's why we discuss it. Oh, okay. Yeah. Does the statute relate to local, bring it down to local? I believe, I don't know this for sure anymore, Your Honor, but about ten years ago we did do a lot of looking at local numbers and that was by regulation. I think it might have been by regulation. I don't know. Personally, I think the local numbers are important, but Social Security changed gears and we don't look at local numbers anymore. We just look at national numbers. But either way, with local numbers, you'd still have to have a way of determining what is a real number versus what is a gut feeling number. And that's kind of where we're at here. But the ALJ discounted the vocational experts' estimates based on the objection that was made here and accounted for the imprecision, I guess, is the most charitable way that could be the process or the methodology could be described, and said even assuming a large margin of error, there's a significant number of jobs. So why isn't, to the extent that the judge sort of took account of the flaws in the methodology or at least the imprecision in the methodology? I don't think you can even make the leap the judge made until you have some indices that the larger group that he was looking at had reliability, and that's the point. The reliability is not there. We could say, well, there's 100,000 stars out there, so there must be 10,000. But there's probably trillions of stars. But who knows? But the point is that you can't, at least in my argument, you just can't make the leap the judge did. Right. Well, what's the legal standard, though? I mean, we're not in 702 territory here, right? The legal standard is reliable. And when we didn't look at how this pie was baked very carefully about 15 years ago. Ever until recently. That's right. But once we started to really look at how the pie was baked, it became clear that this top-down methodology would not get us where we need. Right. But if we authorize relief here, and certainly if we order benefits granted here, you'd be, like, nationally famous for achieving that because this is the way it's been done for decades, right? Right. Well, I argued a Chavez case. I got my 15 minutes' worth of fame, so I don't need to worry about that. But it's happening. I mean, this is a big deal. It is a big deal. But it's because of, in this circuit, because of the case law we have, the most proficient Social Security attorneys are objecting every single time. And they've told us for years and years they were going to fix this and get us some reliable numbers attached to dictionary of occupational titles categories, and we're still not there. Are there any regulations that govern the process by which these objections have to be raised, or is this just happening on the fly during the hearing? Well, there's a case I can't recall that said we had to object. The objection is kind of silly because it's just an objection that the method's not reliable. Right, but there's no regulations that govern the procedure for objecting to a VE, either as to qualifications or method. This is a method objection. Yeah, essentially what the attorney's saying is that the methodology yields unreliable numbers. But that doesn't have to be lodged ahead of time so that everyone can prepare to litigate the issue? Mostly because we don't know what the judge's hypotheticals are going to be until we reach the end of the hearing. But you know what method these VEs are going to use because it's been used for decades. In general. Right, so if there's going to be an omnibus objection to using this method that relies on an outdated dictionary of occupational titles and then does a mathematical computation. I would much rather do it that way because then I don't have to bother judges at the end of hearings with all these speeches I have to do. Right, but it would also put everyone on notice that they're going to be put to the burden here. That's true. Of some reliable method, establishing proof of some reliable method. I think within this circuit, people, and I went past my time, but I'll finish the question. I'll sit down when you tell me to. In this circuit, everybody's on notice because the case law is clear. The rest of the country, because Social Security doesn't regard a circuit court's authority as nationwide and gets into acquiescence law, they essentially ignore it. The best guidance that we have received in a long time came from the BSTEC case, which is the Supreme Court case. And yet the Supreme Court case only talks about the bottom-up methods because that was what was at issue. And I don't have much more to add, Your Honor. The case law is what it is, and if we are attorneys who represent our clients the way we're supposed to, we have to bring it up and argue it, and that's why we're here today. Understood. Thank you. Thank you, Counsel. May it please the Court. My name is Kia Jeffrey, representing the Commissioner of Social Security. Mr. Brace has characterized the vocational expert's testimony as unreliable because his job number estimates were estimates. But this Court has recognized in the Chavez case and the Supreme Court recognized in BSTEC that in this arena, estimates are necessary. What matters is whether the testimony is reliable. And here, the vocational expert explained why his numbers were unreliable. He stated that they were based on his expertise in job markets and how these jobs are performed. And the vocational expert's expertise in this case was clear. He provided his CV, which was in the record, which noted that he had a master's degree specializing in vocational. This isn't a qualifications challenge. This is a methodology challenge. So can you explain the methodology in a couple of clear sentences? Your Honor, the vocational expert testified that he used the SCO categories and weighted them to arrive at job number estimates in the smaller DOT categories. But how is that weighting done? Your Honor, he did not provide a further explanation for how he weighted the numbers. And I don't believe counsel asked further questions about how that weighting occurred. And in discussing the vocational expert's expertise, I think what's important is that he was doing the day-to-day actual work of placing people in jobs. So he had an idea of, in the actual industry at that time, how those jobs were performed and how they exist. Right. This is not a challenge to his qualifications or his experience. This is a challenge to the method that's used, and frankly, not just in this case but in every case. Yes, Your Honor. So this is a broad-spectrum challenge to the methodology that vocational experts are using in all of these cases. And I'll speak for myself. I'd like, if you can, if you would describe in a few clear sentences what the methodology actually consists of. Your Honor, I can explain what the vocational expert testified to, which was that- Right, but he didn't really explain it. There's just a couple of sentences where he says, I make this mathematical computation from the DOT divided by the OES. I think that's the right initial acronym. OES, yes. And then I weight them. End of explanation. Yes, Your Honor, and that was- But you litigate these cases all the time, right? Do you understand what the process involves? Well, Your Honor, I think the reason why I keep going back to the expertise is because they have that expertise to do that weighting. But they should then have the expertise to explain it. We don't have that further testimony here, but we also don't have further questioning from counsel regarding how that weighting occurred. And we do, as Your Honor pointed out, we also have the ALJ's discussion of counsel's objection and the ALJ's recognition that there was a possibility of a margin of error here. Right, that's kind of like a harmless error analysis. The judge discounted the estimate. Yes. Rough justice, there is a significant number, even if it's not 140,000. Yes, Your Honor. We don't know what that is. And what the regulations require is a significant number of jobs. The regulations do not require a specific number of jobs. In Chavez, in Biestek, cases repeatedly recognize there's no hard line number that constitutes a significant number of jobs. So what's important is that the ALJ has to consider whether the vocational expert's testimony is reliable. The vocational expert here did explain, in response to counsel's questions, in response to the ALJ's questions, did explain how he used his expertise to arrive at job number estimates. And that's, frankly, more than we had in the Chavez case. It's very different from the Chavez case because in that case, the vocational expert was pressed four different times to explain his methodology and essentially said that he used a method that was less flawed than other methods. Less what? Less flawed. There's a weighing endorsement. Right. And here, we don't know. But this is the same method, right? Your Honor, I would challenge that it is the same method. I would challenge that it's the same method. How do we know? I think the key word here is that the vocational expert said that he weighted the job numbers. And I understand your concern that we don't have further analysis about how that weighting occurred. But I think if we use the term weighting, it's very difficult to say that that's the same as equal distribution. The vocational expert was using his experience to weight those job numbers. Equal distribution throughout the country, you mean? No, Your Honor. What the Chavez case addressed was equal distribution where a vocational expert would take, say, there's an SCO category containing three different DOT jobs and would divide equally among those jobs to arrive at job numbers. I've got a couple of them written down, call-out operator and semiconductor bonder. Yes, Your Honor. There were three jobs identified by the vocational expert here, call-out operator, semiconductor bonder, and counterclerk. Counterclerk. The Dictionary of Occupational Titles, which is the starting point for all of these opinions, is terribly obsolete, is it not? Your Honor, this court has raised that concern, and the agency is aware that it was published in 1991, and I think— Before artificial intelligence. Yes, before many things. Which is displacing a lot of jobs. Yes, and I think to that point that sort of reaffirms the idea for why a vocational expert who is currently working in the industry is important. Taking account of those realities? Yes, it's important to provide us with job numbers because they're working in the industry currently. But do we have any foundation here to make a reliability determination? I said we're not in Rule 702 land here. This is an agency proceeding. We don't require the same rigor, but how do we make a determination as a reviewing court? And how does even the ALJ make a determination of reliability for that matter? Absent some understanding that the inputs themselves are reliable, to say nothing of the expert's method of dealing with those inputs. I don't understand any of this. It's very confusing based on what's in the record. Yes, Your Honor, and I understand your concern there. I think— Maybe if it were explained better, I'd understand what the expert is actually doing. Yes, Your Honor, I understand, and we are bound by the testimony that was given here. How do we know, and maybe you can describe, what's a call-out operator? Your Honor, those definitions come from the Dictionary of Occupational Titles. But just briefly, that is someone who takes and updates credit card information by phone, is how the Dictionary of Occupational Titles describes that briefly. So all these are defined perhaps 30 years ago? Yes, Your Honor. And those jobs are in India now. Your Honor, I think the vocational expert works in this industry and stated that there were 45,000 of those jobs nationwide currently, as of the time of— Does anybody use a phone anymore to do things like that? Your Honor, I think it is a position that still exists, according to the vocational expert. Probably fax it. I'm sorry, Your Honor. Never mind. I said they probably fax it. That was supposed to be humorous. We have a fax at home. I'm sorry? We have a fax at home. There's just nobody to send it to. So I think what's important is that the vocational expert here, as opposed to in the Chavez case, in the Chavez case, the court suggested the types of markers of reliability that a vocational expert could provide to support his testimony. And those were not apparent in the Chavez case. But here, one of the factors that Chavez mentioned was that the vocational expert could state that he brought his industry experience to bear on the reality of the numbers. And here, the vocational expert expressly stated that. He said that he was looking at how these jobs exist and how they are performed. Whose burden is it? At step five, it's the commissioner's burden, Your Honor. And I would just submit that here, the commissioner met his burden, and the ALJ reasonably relied on the vocational expert's testimony. You've got these old, I mean, 30 years old vocational experts. How are they? Who gets that title? How do they receive that title as a vocational expert? Your Honor, they're contracted with the agency to provide testimony at these hearings. Well, I know, but that's like a CPA. They take a test. In this case, the vocational expert did have a master's degree specializing in the industry, and he was president of a company. Well, not this particular one, but just in general. In general, I think we look at typically these types of people for vocational experts are people who work in the industry and are placing people in jobs. But the idea is they're supposed to take the old 30-year-old things, like we talk about using the phone, and translate that into something more current. They're essentially supposed to, yes, consider the Dictionary of Occupational Titles, but identify how many of those jobs actually still exist, and how many are there across the nation. And that's how we determine if there's a significant number. The job that nobody wants, and the job that no employer wants to hire that person. Well, hopefully not, Your Honor. I mean, I think these are, in this case, we had over 140,000 jobs. Somebody's doing them, in other words, I guess. That's what the vocational expert testified to, and again, he is working in the industry and placing people in jobs. So I would submit that's why his testimony was reliable. Is that what he does? Is that his profession? He gets jobs for people? Yes, Your Honor. He testified that he places people in jobs and works on work adjustment, so people who do have impairments and need to be rehabilitated and find new jobs. So he really does have specific expertise on this issue. And if the panel doesn't have further questions for me, we would just ask that the Commissioner's decision be affirmed. Thank you. Thank you. May I have 30 more seconds, Your Honor? Yes, you may. Thank you. We've been around the barn on this issue many times. I think the time has come to award the disability claimant benefits on the basis that they have not met their burden. I believe that if you do that in strong enough terms, we will see the process being cleaned up. There are ways to come up with numbers. We have statistical areas. For example, the Indianapolis area, the statistical area is very close to the whole nation. All I've got to do is poll right in that area, and we'll have good numbers. Thank you. Thanks to both counsel, and the case is taken under advisement. And the last case is submitted on the briefs, so the Court will stand in recess. Thank you. Thank you.